623 S.E.2d 840

**The STATE, Appellant,**

v.

**Victor PICHARDO and Lorenzo Victoria Reyes, Respondents.**

No. 4036.

Court of Appeals of South Carolina.

Heard Oct. 12, 2005.

Decided Oct. 31, 2005.

Rehearing Denied Jan. 19, 2006.

---

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Randolph Murdaugh, III, of Hampton, for Appellant.

Acting Chief Attorney Joseph L. Savitz, III, of Columbia, for Respondent Victor Pichardo.

James G. Longtin, of Walterboro, for Respondent Lorenzo Victoria Reyes.

ANDERSON, J.:

Victor Pichardo and Lorenzo Victoria Reyes were indicted for trafficking in heroin. Prior to trial, Pichardo and Reyes made separate and identical motions to suppress drug evidence discovered in the search of Reyes' automobile. The circuit judge granted the motions. The State appeals the order suppressing the drug evidence. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

On September 18, 2002, Pichardo and Reyes were traveling north on I–95 in a vehicle owned by Reyes. Pichardo was driving the vehicle and Reyes was in the front passenger seat. Colleton County Sheriff's Deputy Christopher Stevers stopped the vehicle "[f]or failure to maintain a lane." Pichardo told Stevers that Reyes owned the vehicle and that he was driving because Reyes was sleepy.

Deputy Stevers called Deputy William G. Polk for backup. Stevers asked Polk if he could speak Spanish to assist the interrogation.

Deputy Stevers requested Pichardo's license. Pichardo stated he left his license at home. Pichardo informed Stevers that he and Reyes were traveling from Miami to New York City. Stevers advised Pichardo that he was going to give him "a warning ticket for no license." Stevers asked Pichardo to exit the vehicle and stand behind the trunk so he could give him the warning ticket.

Deputy Stevers then approached Reyes and asked for his license and the vehicle registration, which Reyes handed to Stevers. Deputy Stevers "noticed a lot of nervousness about Mr. Reyes while he was sitting in the front seat of the car." Stevers asked Reyes to exit the vehicle and stand behind the trunk with Pichardo. Stevers instructed Reyes that he would have to drive since Pichardo did not have his driver's license with him.

Reyes related to Stevers that he and Pichardo had been in Miami and were driving to New York, where they live. Reyes walked to the rear of the car to exchange positions with Pichardo as driver. At that time, Deputy Stevers: (1) told the men to have a good day and be careful; (2) shook Pichardo's

hand; (3) returned their paperwork; and (4) turned away from the men. Stevers then turned back around and "asked [Pichardo and Reyes] if [he] could ask them a question and they both turned to [him]." Stevers "explained to them the situation that we have on I–95, especially since 9–11, with persons running illegal contraband up and down the highway and weapons and so forth ... and then asked both of them for consent to search the vehicle." Stevers declared Pichardo and Reyes "both nodded in the affirmative." Pichardo claimed he "told [Stevers], I got no problem with that but this is not my car."

After Deputy Polk arrived, he initiated a pat-down of Pichardo and Reyes for safety purposes. Deputy Polk asked Pichardo and Reyes if they had a "pistola." Polk stated: "That's what I normally do when I have Spanish persons."

During the search of the vehicle, Stevers discovered "a kilo" of heroin hidden inside the right rear passenger door.

At the suppression hearing, Pichardo testified that Reyes "don't speak English at all." Pichardo professed that, when he and Reyes are together, Pichardo "talk[s] most of the time for him because he don't understand [English]." Pichardo, who speaks English, said Reyes does not use English except for an occasional request for a cigarette or "a couple of words" like "yes or no but understanding any conversation at all is difficult." Pichardo was not asked to translate anything for Reyes when the stop occurred. According to Pichardo, when Reyes joined him at the rear of the vehicle, Reyes asked Pichardo "what the officer was asking." Pichardo told Reyes that Deputy Stevers "was trying to argue permission to search the car." Pichardo informed Reyes he told the deputy that he did not object to the search but that the car belonged to Reyes. Pichardo claimed Stevers did not ask Reyes for consent to search. Pichardo declared Stevers "went straight to the car."

Sharon Folk, an interpreter and expert in Spanish language and Spanish culture and a professor at the University of South Carolina, Salkehatchie campus, opined that Reyes spoke little or no English, did not "understand" English and had a very limited education.

Reyes testified, through an interpreter, that he speaks "very little" English. He explained he could not understand any of the questions Stevers asked him. He stated that, on the day he was stopped on the interstate, no one asked him for permission to search his vehicle. Reyes declared he "didn't know that they were going to look in the car." When asked if he gave the police permission to search his car, Reyes replied: "No, because I didn't understand what they were saying." Reyes is originally from the Dominican Republic and has maintained a permanent residence in the United States for only three years.

Reyes presented affidavits from several inmates that were in the Colleton County jail with him. These affidavits attested to Reyes' reliance on Spanish for communication.

Deputy Stevers testified regarding his conversation with Reyes. When Stevers asked Reyes for the vehicle registration, Reyes handed it to him. While sitting in the vehicle, Reyes related that he and Pichardo had been visiting family in Miami and were driving to New York City. Stevers stated that, when he asked if he could search the vehicle, Reyes "nodded in the affirmative and said yes or something to that effect." Stevers opined that Reyes "understood what [he] was asking for."

At the hearing, the Solicitor stipulated Deputy Stevers did not tell Pichardo and Reyes they were free to leave. The Solicitor declared: "Your Honor, now that I've reviewed my report here, I had another case that Stevers was involved in, and I believe your recollection is correct here that he told him to have a good day. He did not say you're free to go." Stevers testified: "I told [Pichardo] to have a good day, they were free to go."

A stipulation is an agreement, admission or concession made in judicial proceedings by the parties thereto or their attorneys. *Porter v. South Carolina Pub. Serv. Comm'n,* 333 S.C. 12, 507 S.E.2d 328 (1998); *Kirkland v. Allcraft Steel Co.,* 329 S.C. 389, 496 S.E.2d 624 (1998); *South Carolina Dep't of Transp. v. Richardson,* 335 S.C. 278, 516 S.E.2d 3 (Ct.App.1999). Stipulations are binding upon those who make them. *Id.; see also Webster v. Holly Hill Lumber Co.,* 268 S.C. 416, 234 S.E.2d 232 (1977) (stating a stipulation is

an agreement, an understanding, that is to be construed like a contract, to effect the intent of the parties); *State v. Anderson*, 318 S.C. 395, 399–400, 458 S.E.2d 56, 58 (Ct.App. 1995) ("Generally, a stipulation is an agreement between the parties to which there must be mutual assent."); *Black's Law Dictionary* 1415 (6th ed.1990) (defining a stipulation as a "[v]oluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate need for proof or to narrow range of litigable issues."). The court must accept stipulations as binding upon the parties.

After hearing oral arguments and reviewing briefs and video evidence, the circuit judge found "the stop was legal and the defendant[s] properly detained." The judge concluded the search was "an exploitation of the original stop." He ruled "there was no reasonable suspicion to further detain or question [Pichardo and Reyes] after Pichardo was given the warning ticket." The judge determined: "I find that [voluntary consent] has not been shown here even by a preponderance of the evidence. As such, I cannot infer voluntary consent and must find that no such voluntary consent was given and that the search is invalid." Finally, the judge held the search was improper because it was "not based upon probable cause or suspicion and was still with the scope of the traffic stop and exploitive of that stop . . .; and that no voluntary consent by Reyes, the foreign speaking owner of the vehicle was ever obtained." The judge suppressed all evidence obtained in the search of Reyes' automobile. .

## STANDARD OF REVIEW

 The appellate standard of review in Fourth Amendment search and seizure cases is limited to determining whether any evidence supports the trial court's finding. *State v. Brockman*, 339 S.C. 57, 528 S.E.2d 661 (2000); *State v. Jones*, 364 S.C. 51, 610 S.E.2d 846 (Ct.App.2005); *State v. Green*, 341 S.C. 214, 532 S.E.2d 896 (Ct.App.2000). The appellate court may only reverse where there is clear error. *Id.; see also State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001) (holding in a criminal case the appellate court is bound by the trial court's preliminary factual findings in determining the admissibility of certain evidence unless the findings are clearly

erroneous, and its review extends only to determining whether the trial judge abused his discretion).

The "clear error" standard means that an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently. *Easley v. Cromartie*, 532 U.S. 234, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001). Rather, the appellate court must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed. *Id.*

An appellate court must affirm the trial court's ruling if there is *any* evidence to support the ruling. *Brockman*, 339 S.C. at 66, 528 S.E.2d at 666. Accordingly, we will apply an "any evidence" standard to the circuit judge's ruling. *See State v. Williams*, 351 S.C. 591, 571 S.E.2d 703 (Ct.App.2002).

## LAW/ANALYSIS

### I. Right to Appeal

Initially, we determine whether the State has the right to appeal the judge's order suppressing the drug evidence.

In South Carolina, the State's right to appeal is defined by our judicial decisions, not statutory law. *State v. McKnight*, 353 S.C. 238, 577 S.E.2d 456 (2003). Thus, the State's right to appeal in a criminal case is a judicially created right. *State v. Belviso*, 360 S.C. 112, 600 S.E.2d 68 (Ct.App. 2004).

Our Supreme Court has recognized limited situations where the State may appeal. *State v. Holliday*, 255 S.C. 142, 177 S.E.2d 541 (1970). A pre-trial order granting the suppression of evidence which significantly impairs the prosecution of a criminal case is directly appealable. *State v. Mabe*, 306 S.C. 355, 412 S.E.2d 386 (1991); *State v. McKnight*, 287 S.C. 167, 337 S.E.2d 208 (1985); *State v. Henry*, 313 S.C. 106, 432 S.E.2d 489 (Ct.App.1993); *see also* S.C.Code Ann. § 14-3-330(2)(a) (1977) ("The Supreme Court shall have appellate jurisdiction for correction of errors of law in law cases, and shall review upon appeal ... [a]n order affecting a substantial right made in an action when such order ... in effect determines the action and prevents a judgment from which an

appeal might be taken or discontinues the action."). The State has the right to immediately appeal a trial court's suppression of evidence which significantly impairs the prosecution of the case. *Belviso*, 360 S.C. at 115, 600 S.E.2d at 70.

There is *no* direct statement emanating from the State in regard to an allegation that the order will significantly impair the prosecution of its case. However, factually and legally, if this court affirms the order of the circuit judge, the prosecution of the case against Pichardo and Reyes is eviscerated and annihilated.

## II. Search of Reyes' Vehicle

The State argues the trial court erred in suppressing the evidence obtained from a search of Reyes' vehicle. The State claims the court's findings that the search exploited the traffic stop and there was no voluntary consent by Reyes are not supported by the record. We disagree.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV; *see State v. Woodruff*, 344 S.C. 537, 544 S.E.2d 290 (Ct.App.2001). Thus, the Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *State v. Maybank*, 352 S.C. 310, 573 S.E.2d 851 (Ct.App.2002). Thus, an automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren*, 517 U.S. at 810, 116 S.Ct. 1769. Where probable cause exists to believe that a traffic violation has occurred, the decision to stop the automobile is reasonable per se. *Id.* The police may also stop and briefly detain a vehicle if they have a reasonable suspicion that the occupants

are involved in criminal activity. *State v. Butler,* 343 S.C. 198, 539 S.E.2d 414 (Ct.App.2000).

The testimony of Deputy Stevers was that he stopped the vehicle because Pichardo failed to maintain his lane. This evidence was not challenged. The vehicle was legally stopped and Pichardo and Reyes detained. However, Pichardo and Reyes contend that, once the traffic stop was concluded, Deputy Stevers needed a reasonable suspicion that some further criminal activity was afoot in order to begin questioning Pichardo and Reyes.

Once a motor vehicle is detained lawfully for a traffic violation, the police may order the driver to exit the vehicle without violating Fourth Amendment proscriptions on unreasonable searches and seizures. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *State v. Williams,* 351 S.C. 591, 571 S.E.2d 703 (Ct.App.2002). In carrying out the stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Sullivan,* 138 F.3d 126 (4th Cir.1998). However, any further detention for questioning is beyond the scope of the stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime. *Id.*

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop and the scope of the detention must be carefully tailored to its underlying justification. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999). Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *Id.; see also United States v. Jones,* 234 F.3d 234, 241 (5th Cir.2000) ("The basis for the stop was essentially completed when the dispatcher notified the officers about the defendants' clean records, three minutes before the officers sought consent to search the vehicle. Accordingly, the officers should have ended the detention and allowed the defendants to leave. And the failure to release the defendants violated the Fourth

Amendment."); *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."); *United States v. Beck,* 140 F.3d 1129, 1136 (8th Cir.1998) ("Because the purposes of [the officer's] initial traffic stop of Beck had been completed ... [the officer] could not subsequently detain Beck unless events that transpired during the traffic stop gave rise to reasonable suspicion to justify [the officer's] renewed detention of Beck."); *People v. Redinger,* 906 P.2d 81, 85–86 (Colo.1995) ("When, as here, the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens."); *Davis v. State,* 947 S.W.2d 240, 243 (Tex. Crim.App.1997) ("[O]nce the reason for the stop has been satisfied, the stop may not be used as a 'fishing expedition for unrelated criminal activity.' ") (citations omitted).

 Once the underlying basis for the initial traffic stop has concluded, it does not automatically follow that any further detention for questioning is unconstitutional. Fourth Amendment jurisprudence clarified:

> Lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.

*United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir. 1998) (citations omitted). Thus, a law enforcement officer's continued questioning of a vehicle's driver and passenger outside the scope of a valid traffic stop passes muster under the Fourth Amendment either when the officer has a reasonable articulable suspicion of other illegal activity or when the valid traffic stop has become a consensual encounter.

100

■ The question in this case is whether Deputy Stevers detained, i.e. "seized" Pichardo and Reyes anew, thereby triggering the Fourth Amendment or simply initiated a consensual encounter invoking no constitutional scrutiny. *See State v. Williams*, 351 S.C. 591, 571 S.E.2d 703 (Ct.App.2002); *see also Ferris*, 735 A.2d at 500 (stating the difficult question was whether the trooper's questioning of Ferris after he issued a citation and returned his driver's license and registration "constituted a detention, and hence raise[d] any Fourth Amendment concerns, or was merely a 'consensual encounter[ ]' . . . implicating no constitutional overview").

A consensual encounter has been defined as simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official. *Ferris*, 735 A.2d at 500 n. 4; *Williams*, 351 S.C. at 599 n. 2, 571 S.E.2d at 708 n. 2. Because an individual is free to leave at any time during such an encounter, he is not "seized" within the meaning of the Fourth Amendment. *Id.*

■ Mere police questioning does not constitute a seizure for Fourth Amendment purposes. *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see State v. Culbreath*, 300 S.C. 232, 237, 387 S.E.2d 255, 257 (1990) ("Not all personal encounters between policemen and citizens involve 'seizures' of persons thereby bringing the Fourth Amendment into play.") (citations omitted), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). To the contrary, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19–20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated. *United States v. Sullivan*, 138 F.3d 126 (4th Cir.1998); *Williams*, 351 S.C. at 600, 571 S.E.2d at 708.

■ The test for determining if a particular encounter constitutes a seizure within the meaning of the Fourth Amendment is whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567,

108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Analla*, 975 F.2d 119 (4th Cir.1992); *see also Sullivan*, 138 F.3d at 132 ("The test ... [is] whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officer's requests or otherwise terminate the encounter.'") (citations omitted). So long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct taken as a whole. *Chesternut*, 486 U.S. at 573, 108 S.Ct. 1975; *Williams*, 351 S.C. at 600, 571 S.E.2d at 708. Thus, exactly what constitutes a restraint on liberty sufficient to lead a reasonable person to conclude he is not free to leave varies with the setting in which the police conduct occurs. *Id.*

 Reasonableness is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Williams*, 351 S.C. at 600, 571 S.E.2d at 708. As a result, the nature of the reasonableness inquiry is highly fact-specific. *Id.* Although no single factor dictates whether a seizure has occurred, courts have identified certain probative factors, including the time and place of the encounter, the existence and nature of any prior seizure, whether there was a clear and expressed endpoint to any such prior detention, the number of officers present and whether they were uniformed, the length of the detention, whether the officer moved the person to a different location or isolated him from others, whether the officer informed the person he was free to leave, whether the officer indicated to the person that he was suspected of a crime, and whether the officer retained the person's documents or exhibited threatening behavior or physical contact. *See United States v. Beck*, 140 F.3d 1129 (8th Cir.1998); *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999).

 In determining whether Pichardo and Reyes were seized for purposes of the Fourth Amendment, it must be

noted that the detention associated with roadside searches is unlike a mere field interrogation where an officer may question an individual without grounds for suspicion. *See Williams,* 351 S.C. at 600–01, 571 S.E.2d at 708. Roadside consent searches are instead more akin to an investigatory stop that does involve a detention. *Id.* A traffic stop, or preexisting seizure, enhances the coercive nature of the situation and the efficacy of the other factors in pointing toward the restriction of liberty. *Ferris,* 735 A.2d at 502. Such a situation, therefore, is "markedly different from that of a person passing by or approached by law enforcement officers on the street, in a public place, or inside the terminal of a common carrier." *Id.* (citations omitted).

 In the instant case, Stevers returned the "paperwork," gave Pichardo his warning ticket, and told him to "have a nice day." The fact that the officer returned the driver's documentation is not always sufficient to demonstrate that an encounter has become consensual. *Daniel v. State,* 277 Ga. 840, 597 S.E.2d 116 (2004). Thus, the return of documents does not conclusively establish that a traffic stop has de-escalated into a consensual encounter. *Id.*

 The Solicitor stipulated that Pichardo was never instructed that he and Reyes could leave. It is well established that the Constitution does not require an officer to inform a motorist he is free to leave before obtaining consent. *See Robinette,* 519 U.S. at 35, 117 S.Ct. 417 (rejecting per se rule that would render consent involuntary if an officer failed to advise a motorist he was free to go before requesting consent). However, the Supreme Court in *Robinette* reiterated that such advice was one factor to consider in the overall analysis. *Id.* at 39, 117 S.Ct. 417. Significantly, in this case the State is bound by the stipulation that Stevers failed to tell Pichardo and Reyes they were free to leave.

The circumstances surrounding the encounter lend support to the circuit judge's conclusion. The two men were isolated while questioned. Stevers requested the two men separately step to the rear of Reyes' vehicle. Two uniformed police officers were present. Pichardo and Reyes were physically searched. There was an immediate transition from the valid traffic stop to the search such that they may not have realized

the initial seizure was over. At this point, the "encounter began to assume the tenor of an investigation." *See Williams,* 351 S.C. at 602, 571 S.E.2d at 709. Pichardo and Reyes were detained beyond the traffic stop. The facts encompassing Stevers' questioning of Pichardo and Reyes support the conclusion that the men were in fact seized.

These circumstances were sufficiently intimidating such that Pichardo and Reyes "could reasonably have believed that [they were] not free to disregard the police presence and go about [their] business." *See Michigan v. Chesternut,* 486 U.S. 567, 576, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *see also People v. In Interest of H.J.,* 931 P.2d 1177, 1181 (Colo.1997) ("It strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel 'free to leave' or 'at liberty to ignore the police presence and go about his business.'") (citations omitted); *Ferris,* 735 A.2d at 502–03 (enumerating several factors that transmuted a valid traffic stop into an unlawful detention, including the trooper's failure to inform Ferris he was free to leave, the trooper's "request" that Ferris step "to the back of his vehicle to answer a couple of questions," the detention seamlessly followed a pre-existing lawful stop, the trooper removed Ferris from his automobile and separated him from his passenger, the presence of two uniformed law enforcement officers, and the fact that the police cruiser emergency flashers remained operative throughout the entire encounter) (footnote omitted).

Deputy Stevers, by prolonging the initial stop beyond its proper scope, rendered the ensuing encounter more coercive than consensual. As the Ohio Supreme Court explained:

"The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow."

*State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762, 770–71 (1997); *see Ferris,* 735 A.2d at 503 ("The moment at which a

traffic stop concludes is often a difficult legal question, not readily discernible by a layperson. It is not sound to categorically impute to all drivers the constructive knowledge as to the precise moment at which, objectively, an initially lawful traffic stop terminates, i.e., the time at which the driver may depart."). A traffic stop must have a distinct ending point which is ascertainable to both the officers charged with enforcing the law and the citizens whom they encounter. *Daniel v. State,* 277 Ga. 840, 597 S.E.2d 116 (2004).

A routine stop constitutes a Fourth Amendment seizure so that when the purpose justifying the stop is exceeded, the detention becomes illegal unless a reasonable suspicion of some other crime exists. *United States v. Sullivan,* 138 F.3d 126 (4th Cir.1998); *see State v. Robinson,* 306 S.C. 399, 402, 412 S.E.2d 411, 413 (1991) ("To justify a brief stop [or] detention, the police officer must have a reasonable suspicion that the person has been involved in criminal activity."). The term "reasonable suspicion" requires a particularized and objective basis that would lead one to suspect another of criminal activity. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *State v. Woodruff,* 344 S.C. 537, 544 S.E.2d 290 (Ct.App.2001). In determining whether reasonable suspicion exists, the whole picture must be considered. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The burden is on the State to articulate facts sufficient to support reasonable suspicion. *State v. Butler,* 343 S.C. 198, 539 S.E.2d 414 (Ct.App.2000).

Here, the only evidence at the suppression hearing of reasonable suspicion was Deputy Stevers' testimony that Reyes was nervous. In light of Reyes' inability to speak English, nervousness alone is not sufficient to support reasonable suspicion of "some other crime." *Sullivan,* 138 F.3d at 131. There was no reasonable suspicion of "some other crime" to further detain or question Pichardo and Reyes after Pichardo was given the warning ticket. Such a search at this point was an exploitation of the original stop rather than a separate and valid search based upon a reasonable suspicion. When Deputy Stevers asked for consent, he detained anew, triggering the Fourth Amendment. Pichardo and Reyes were unconstitutionally detained.

Warrantless searches and seizures are reasonable within the meaning of the Fourth Amendment when conducted under the authority of voluntary consent. *Palacio v. State,* 333 S.C. 506, 511 S.E.2d 62 (1999). Undoubtedly, a law enforcement officer may request permission to search at any time. However, when an officer asks for consent to search *after* an unconstitutional detention, the consent procured is per se invalid unless it is both voluntary and not an exploitation of the unlawful detention. *State v. Robinson,* 306 S.C. 399, 412 S.E.2d 411 (1991); *State v. Williams,* 351 S.C. 591, 571 S.E.2d 703 (Ct.App.2002); *see Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' ") (citation omitted); *Brown v. State,* 188 Ga.App. 184, 372 S.E.2d 514, 516 (1988) ("[I]n order to eliminate any taint from an [illegal] seizure or arrest, there must be proof both that the consent was voluntary and that it was not the product of the illegal detention.").

Proof of a voluntary consent alone is not sufficient. *Williams,* 351 S.C. at 604, 571 S.E.2d at 710; *Brown,* 372 S.E.2d at 516. The relevant factors include the temporal proximity of the illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id.*

The State bears the burden of establishing the voluntariness of the consent. *State v. Harris,* 277 S.C. 274, 286 S.E.2d 137 (1982); *State v. Mattison,* 352 S.C. 577, 575 S.E.2d 852 (Ct.App.2003). Whether a consent to search was voluntary is a question of fact to be determined from the totality of the circumstances. *State v. McKnight,* 352 S.C. 635, 576 S.E.2d 168 (2003); *Mattison,* 352 S.C. at 584, 575 S.E.2d at 855. The issue of voluntary consent, when contested by contradicting testimony, is an issue of credibility to be determined by the circuit judge. *Mattison,* 352 S.C. at 584–

85, 575 S.E.2d at 856. A trial judge's conclusions on issues of fact regarding voluntariness will not be disturbed on appeal unless so manifestly erroneous as to be an abuse of discretion. *Id.* There is ample evidence in the record to support the circuit judge's finding that the State failed to meet this burden and there was no voluntary consent to search.

■ A plethora of evidence in the record buttresses the circuit judge's determination that Pichardo and Reyes were unlawfully detained and that Reyes' purported consent to search was not voluntary. Deputy Stevers initially testified that Reyes gave his consent to the search. However, Stevers thereafter stated he needed to view the video to be certain Reyes responded to Stevers' request to search with a "yes along with a nod." Pichardo and Reyes declared no consent was given or understood by Reyes. Pichardo professed he explained to Reyes what the officer had asked to do. There was expert testimony that Reyes speaks little or no English, did not "understand" English and had a very limited education. Reyes submitted affidavits to the court from several inmates attesting to Reyes' reliance on Spanish for communication. The Stevers video has no audio and was inconclusive in the video rendering of the confrontation. The Polk video had audio but did not include any exchange between Reyes and Stevers in which the consent is alleged. The Stevers video clearly shows Stevers standing on the passenger's side of the vehicle talking across Reyes to Pichardo, who speaks English. The incident report and testimony indicate that Deputy Stevers asked Deputy Polk if he could speak Spanish to assist the interrogation.

The standard of review by the appellate entity is to determine if "any evidence" exists in the record to support the findings of fact and conclusions of law of the circuit judge. We affirm the circuit judge in his ruling that Reyes did not give voluntary consent and there was no valid consent to search the vehicle.

Moreover, the record reveals that Reyes' consent was obtained through Deputy Stevers's exploitation of the unlawful detention. Stevers's testimony before the trial court revealed that a minimal amount of time passed between the seizure and ensuing consent, there were no intervening or attenuating

circumstances, and Stevers's actions in detaining Pichardo and Reyes had no legal basis. *See Williams,* 351 S.C. at 605, 571 S.E.2d at 711. The record unquestionably supports the circuit judge's finding that Reyes' consent was not valid. *See Robinson,* 306 S.C. at 402, 412 S.E.2d at 414; *see also Brown,* 372 S.E.2d at 516 ("[W]e find that there was no significant lapse of time between the unlawful detention and the consent, that no intervening circumstances dissipated the effect of the unlawful detention and that the deputy's conduct had no arguable legal basis. Therefore, we hold that the consent was the product of the illegal detention, and that the taint of the unreasonable stop was not sufficiently attenuated."); *State v. Aleksey,* 343 S.C. 20, 538 S.E.2d 248 (2000) (stating an appellate court may affirm for any reason appearing in the record on appeal).

### CONCLUSION

The heroin found in Reyes' vehicle was discovered through an illegal detention accompanied by a lack of valid consent. Evidence obtained as a result of an unlawful search constitutes a violation of the Fourth Amendment and is inadmissible at trial. *State v. Nelson,* 336 S.C. 186, 519 S.E.2d 786 (1999); *State v. Flowers,* 360 S.C. 1, 598 S.E.2d 725 (Ct.App.2004). The trial court, therefore, did not err in suppressing the evidence. *See State v. Copeland,* 321 S.C. 318, 323, 468 S.E.2d 620, 624 (1996) ("The 'fruit of the poisonous tree' doctrine provides that evidence must be excluded if it would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of the illegality."); *Robinson,* 306 S.C. at 402, 412 S.E.2d at 414 (suppressing drug evidence as the fruit of an unlawful stop because no attenuating circumstances removed the taint of the illegality from the consent to search); *State v. Greene,* 330 S.C. 551, 559, 499 S.E.2d 817, 821 (Ct.App.1997) ("The fruit of the poisonous tree doctrine holds that where evidence would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of that illegality, the evidence must be excluded."); *People v. Brownlee,* 186 Ill.2d 501, 239 Ill.Dec. 25, 713 N.E.2d 556 (1999) (suppressing marijuana as fruit of an illegal detention, where officers legitimately stopped vehicle for investigation of a traffic violation but after returning driver's license and insur-

ance card and stating no citation would be issued officers paused for a couple of minutes and then asked for and obtained consent to search the vehicle, because during this time the driver and his passengers were detained without reasonable suspicion of any criminal activity).

Accordingly, the circuit judge's order suppressing the drug evidence is

**AFFIRMED.**

HUFF and WILLIAMS, JJ., concur.