732 S.E.2d 218
**The STATE, Appellant,**
v.
**Randy VICKERY, Respondent.**
**No. 5025.**
Court of Appeals of South Carolina.
Heard March 20, 2012.
Decided Aug. 22, 2012.
Rehearing Denied Sept. 20, 2012.

Assistant Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General William M. Blitch, Jr., of Columbia, for Appellant.

Chief Appellate Defender Robert M. Dudek, of Columbia, for Respondent.

KONDUROS, J.

In this criminal case, the State appeals the trial court's suppression of evidence arising out of a driver's license checkpoint because it alleges the checkpoint was constitutional. We reverse and remand.

## FACTS/PROCEDURAL HISTORY

Sometime between 9 p.m. April 25, 2009, and 3 a.m. April 26, 2009, officers with the Greenwood Police Department conducted a license checkpoint at the intersection of New Market Street and Milwee Avenue in Greenwood, South Carolina. During that checkpoint, while detaining Randy Jason Vickery for suspicion of driving under the influence, officers spotted methamphetamines and drug paraphernalia in his vehicle and arrested him. That same night, the Greenwood Police Department conducted three other checkpoints in the same vicinity from 9 p.m. until 3 a.m. The four checkpoints

produced a total of fifty-six violations, including forty-eight traffic cases and eight criminal cases.

Vickery was indicted for possession of methamphetamine with intent to distribute and possession of methamphetamine with intent to distribute within proximity of a school. At trial, Vickery made a motion to suppress the evidence discovered as a result of the stop, challenging the stop's constitutionality, arguing it violated the Fourth Amendment. The State presented the testimony of Officer Robbie Byrd. Officer Byrd testified he was employed by the Greenwood Police Department in the traffic unit. He stated that on the night of April 25, 2009, through the morning of April 26, he conducted traffic safety checkpoints. He testified that checkpoint locations were determined based on "traffic flow, speeding complaints, loud music complaints, anything such as that nature, primarily just involving traffic." He indicated that the checkpoint locations were selected by Lieutenant Jennifer Bass, who was over the traffic unit, and Major James Marshall. He stated that they had contact with the citizens who were complaining about speeding and loud music coming from cars. Officer Byrd stated the primary purpose of the checkpoints was to check for traffic safety, such as child restraints, seatbelts, driver's licenses, vehicle tags, and the proper credentials. He testified the officers would stop each car that came through the checkpoint and check each driver's license. He further testified the four checkpoints that night resulted in forty-eight traffic cases and two drug cases. He testified the stops that produced no violations lasted no longer than a minute.

Following Officer Byrd's testimony, Vickery argued the State had not laid the proper foundation to establish the checkpoint's constitutionality under *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), and *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). He argued *State v. Groome,* 378 S.C. 615, 664 S.E.2d 460 (2008), was "adamant" the State must present empirical data gathered prior to the checkpoint to justify setting up the checkpoint. He maintained the State only provided empirical data on the "back side, what the results were, but they have produced nothing to indicate why the Greenwood Police Department wanted to set up a checkpoint here." He asserted the State needed to provide infor-

mation as to how many tickets were written and people had been arrested on the road in the month or year prior to the checkpoint. He stated those who established the checkpoints needed to testify and supply the empirical data.

The State responded and agreed *Sitz*, while critical of the searching examination of effectiveness by trial courts, "retains the requirement that the State produce empirical data to support the roadblock." It argued the report marked Court Exhibit Number 1 established how the checkpoint was effective and what the results were. Vickery argued that report "would probably be very good empirical data for the next checkpoint that they want to have at this location." He asserted that the State was arguing that if it set up a checkpoint and arrested forty-eight people, then it was a good checkpoint. Vickery argued, "It's data on the front side [that case law requires], not on the back side."

Before adjourning for lunch, the trial court stated it was going to take the matter under advisement and would leave the record open if the State wished to see if the file contained any additional empirical data. Following the break, the State called Major Urban Mitchell to testify. He stated he was in charge of the administration division of the Greenwood Police Department. He stated that the position involved records, training, evidence, and crime scenes and included gathering statistics. The State introduced, for the purposes of the hearing, several traffic enforcement activity reports that included the intersection of New Market and Milwee or an intersection located two blocks away. Major Mitchell testified that the police department had determined that conducting traffic safety checkpoints was an effective way to manage traffic problems. On cross-examination, Major Mitchell could not say how many of the fifty-six violations on April 26 occurred at the intersection of New Market and Milwee but admitted fifty-six tickets at the police headquarters could be obtained to show which of the incidents occurred at that intersection.

The trial court found the State presented

insufficient empirical data justifying the authorization and implementation of the roadblock in question. . . . Except for the traffic testimony offered by Major Mitchell, no testimo-

ny was offered by the State about the number of tickets, wrecks, and/or citizen complaints related to traffic concerns at the intersection of New Market Street and Milwee Avenue prior to the roadblock in question. Testimony by the State's witnesses indicates that the Greenwood Police Department relied on general knowledge of the neighborhood to justify the roadblock in question.

The trial court further found:

[T]he Traffic Enforcement Activity Reports contain some empirical data regarding the intersection of New Market Street and Milwee Avenue, but the data presented is insufficient to constitutionally justify the roadblock on April 25, 2009, at which [Vickery] was stopped and arrested. The record is absent of any specific evidence for the Court to determine the number of cases which resulted from the roadblock in question. Furthermore, the evidence in the record is insufficient for the Court to determine the effectiveness of the roadblock in question. No testimony was presented about how many vehicles passed through the roadblock in question.

The court determined the roadblock "did not violate [Vickery's] Fourth Amendment rights because its primary purpose was traffic safety enforcement." However, the court found the roadblock did violate his Fourth Amendment rights because

the State provided insufficient empirical data to support the effectiveness of the roadblock in question. Without sufficient empirical data to justify the implementation of the roadblock and without sufficient data derived from conducting this roadblock, the Court is unable to do the necessary comparison analysis to determine the effectiveness of this roadblock as required under *Brown v. Texas,* 443 U.S. 47 [99 S.Ct. 2637, 61 L.Ed.2d 357] (1979).

Accordingly, the trial court granted Vickery's motion to suppress and suppressed all drugs and drug paraphernalia located in Vickery's vehicle and on his person, as well as all statements made, observations of his behavior, and recordings. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus,* 367 S.C. 41, 48, 625

S.E.2d 216, 220 (2006). Thus, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous. *Id.* The South Carolina Supreme Court has articulated the standard of review to apply to Fourth Amendment search and seizure cases. *State v. Brockman,* 339 S.C. 57, 66, 528 S.E.2d 661, 666 (2000). The court has specifically rejected the de novo standard the United States Supreme Court set forth in *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), for reviewing determinations of reasonable suspicion and probable cause in the context of warrantless searches and seizures. *State v. Williams,* 351 S.C. 591, 597, 571 S.E.2d 703, 706 (Ct.App.2002). The *Brockman* court determined the trial court's ruling would be reviewed like any other factual finding: reversed if there is clear error and affirmed if any evidence supports the ruling. 339 S.C. at 66, 528 S.E.2d at 666.

> On appeals from a motion to suppress based on Fourth Amendment grounds, this Court applies a deferential standard of review and will reverse if there is clear error. However, this deference does not bar this Court from conducting its own review of the record to determine whether the trial judge's decision is supported by the evidence.

*State v. Tindall,* 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010) (citation omitted). Under the clear error standard, "an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently." *State v. Pichardo,* 367 S.C. 84, 96, 623 S.E.2d 840, 846 (Ct.App.2005). Rather, the appellate court must determine whether, based on the evidence, it is left with the definite and firm conviction the trial court committed a mistake. *Id.* Accordingly, we will apply an any evidence standard to the trial court's ruling. *Williams,* 351 S.C. at 597, 571 S.E.2d at 707.

## LAW/ANALYSIS

The State contends the trial court erred in suppressing the stop by finding the State failed to produce sufficient empirical data to justify the effectiveness of the checkpoint. We agree.

The Fourth Amendment guarantees a person the right to be secure from unreasonable searches and seizures.

U.S. Const. amend. IV; *State v. Butler,* 343 S.C. 198, 201, 539 S.E.2d 414, 416 (Ct.App.2000). "[T]he Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention." *State v. Pichardo,* 367 S.C. 84, 97, 623 S.E.2d 840, 847 (Ct.App.2005) (citing *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). "[S]topping a vehicle at a checkpoint constitutes a seizure of a person within the meaning of the Fourth Amendment." *United States v. Brugal,* 209 F.3d 353, 356 (4th Cir.2000) (citing *Mich. Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)).

> Constitutional challenges to checkpoint seizures turn on whether the initial stop at the checkpoint was reasonable.... Whether particular checkpoint seizures are reasonable is determined by balancing the gravity of the public interest sought to be advanced and the degree to which the seizures do advance that interest against the extent of the resulting intrusion upon the liberty interests of those stopped.

*Id.* (citing *Sitz,* 496 U.S. at 449–55, 110 S.Ct. 2481).

The United States Supreme Court has applied this balancing analysis and "upheld the constitutionality of government checkpoints set up to detect drunken drivers, *see* [*Sitz,* 496 U.S. at 454, 110 S.Ct. 2481], and illegal immigrants, *see Martinez–Fuerte,* 428 U.S. at 556–67, 96 S.Ct. 3074 ..., so long as they involve no more than an 'initial stop ... and the associated preliminary questioning and observation by checkpoint officers.'" *Id.* at 356–57 (quoting *Sitz,* 496 U.S. at 450–51, 110 S.Ct. 2481) (second ellipses added by court). "The seizure at the sobriety checkpoint upheld in *Sitz* lasted approximately twenty-five seconds, and the seizures at the immigration checkpoint upheld in *Martinez–Fuerte* lasted three to five minutes." *Id.* at 357 (citations omitted).

"The [United States] Supreme Court has also recognized that a state has a substantial interest in enforcing licensing and registration laws, though that interest is not substantial enough to justify roving patrol stops as an enforcement mechanism." *Id.* (citing *Delaware v. Prouse,* 440 U.S.

648, 658–59, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). However, the Court suggested in *Prouse,* "checkpoints to check driver's licenses would be permissible even in the absence of articulable and reasonable suspicion that a driver was unlicensed." *Id.* (citing *Prouse,* 440 U.S. at 663, 99 S.Ct. 1391; *Texas v. Brown,* 460 U.S. 730, 743, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) (noting that the circumstances surrounding stop at driver's license roadblock gave "no suggestion that the roadblock was a pretext whereby evidence of a narcotics violation might be uncovered in 'plain view' in the course of a check for driver's licenses")).

> Drawing on these authorities, courts have concluded that a brief stop at a checkpoint for the limited purpose of verifying a driver's license, vehicle registration, and proof of insurance is a reasonable intrusion into the lives of motorists and their passengers even in the absence of reasonable suspicion that a motorist or passenger is engaged in illegal activity.

*Id.* (citing *United States v. Galindo–Gonzales,* 142 F.3d 1217, 1221 (10th Cir.1998) (finding brief detention of motorist to inspect driver's license, vehicle registration, and insurance information at an established license checkpoint comports with the Fourth Amendment); *United States v. McFayden,* 865 F.2d 1306, 1310–13 (D.C.Cir.1989) (finding a roadblock to inspect drivers' licenses and vehicle registrations met the Fourth Amendment standard of reasonableness)).

> [T]he Court has determined that the gravity of the public interests that such stops seek to advance and the general efficacy of checkpoint stops in advancing those interests outweigh the minimal intrusions on protected Fourth Amendment liberty interests that are caused by the brief stops required for such limited questioning and observation. But, the Court has also cautioned that "[d]etention of particular motorists for more extensive ... testing may require satisfaction of an individualized suspicion standard."

*Norwood v. Bain,* 143 F.3d 843, 848 (4th Cir.1998) (ellipsis and last set of brackets by court) (quoting *Sitz,* 496 U.S. at 451, 110 S.Ct. 2481), *vacated, aff'd this ground on reh'g en banc,* 166 F.3d 243, 245 (4th Cir.1999). "[A] claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review." *Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. 3074.

In *State v. Groome*, 378 S.C. 615, 619, 664 S.E.2d 460, 462 (2008), the trial court found a roadblock violated the Fourth Amendment under *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The *Groome* court noted *"Brown* established a three part balancing test for determining the constitutionality of a traffic checkpoint: 1) the gravity of the public interest served by the seizure; 2) the degree to which the seizure serves the public interest; and, 3) the severity of the interference with individual liberty." *Id.* at 619, 664 S.E.2d at 462. The trial court held the first and third factors easily weighed in the State's favor but found the State presented no evidence on the second factor. *Id.*

On appeal, the State argued the trial court abused its discretion in finding the State failed to meet the second *Brown* factor, the "effectiveness" requirement. *Id.*

> The State argues that it need not introduce evidence about the specific effectiveness of this roadblock because, by its very nature, every license check roadblock determines whether the driver is legally licensed. The State's position that license check roadblocks are *ipso facto* constitutional, thereby eliminating the requirement of effectiveness from the *Brown* formula relies upon [*Sitz*]. While *Sitz* does criticize "searching examination of effectiveness" by trial courts, it retains the requirement that the State produce empirical data to support the effectiveness of its roadblock. *Sitz*, [496 U.S.] at 454 [110 S.Ct. 2481] ("unlike [*Prouse* ], this case [does not involve] a complete absence of empirical data. . . ."). The record supports the trial court's finding that the State failed to produce any evidence satisfying the second prong of the *Brown* test.

*Groome*, 378 S.C. at 619–20, 664 S.E.2d at 462 (ellipsis and last set of brackets added by court).

In *Sitz*, 496 U.S. at 453, 110 S.Ct. 2481, the Michigan Court of Appeals "consider[ed] as part of the balancing analysis the 'effectiveness' of the proposed checkpoint program." The United States Supreme Court found the court of appeals erred in concluding the checkpoint program failed the effectiveness part of the test and the failure materially discounted the State's strong interest in implementing the program. *Id.* The court noted, "The actual language from *Brown v. Texas*, upon

which the Michigan courts based their evaluation of 'effectiveness,' describes the balancing factor as 'the degree to which the seizure advances the public interest.' " *Id.* (quoting *Brown*, 443 U.S. at 51, 99 S.Ct. 2637). "This passage from *Brown* was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Id.* "But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Id.* at 453–54, 110 S.Ct. 2481. "*Brown's* rather general reference to 'the degree to which the seizure advances the public interest' was derived, as the opinion makes clear, from the line of cases culminating in *Martinez–Fuerte*, .... Neither *Martinez–Fuerte* nor [*Prouse*], however, the two cases cited by the Court of Appeals as providing the basis for its 'effectiveness' review, ... supports the searching examination of 'effectiveness' undertaken by the Michigan court." *Id.* at 454, 110 S.Ct. 2481.

The *Sitz* court further noted:

In *Delaware v. Prouse*, we disapproved random stops made by Delaware Highway Patrol officers in an effort to apprehend unlicensed drivers and unsafe vehicles. We observed that *no* empirical evidence indicated that such stops would be an effective means of promoting roadway safety and said that "[i]t seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed."

*Id.* (quoting *Prouse*, 440 U.S. at 659–60, 99 S.Ct. 1391) (alteration by court). The court "observed that the random stops involved the 'kind of standardless and unconstrained discretion [which] is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.' " *Id.* (quoting *Prouse*, 440 U.S. at 661, 99 S.Ct. 1391) (alteration by court).

The *Sitz* court found that "[u]nlike *Prouse*, this case involves neither a complete absence of empirical data nor a challenge to random highway stops." *Id.*

During the operation of the Saginaw County checkpoint, the detention of the 126 vehicles that entered the checkpoint resulted in the arrest of two drunken drivers. Stated as a percentage, approximately 1.6 percent of the drivers passing through the checkpoint were arrested for alcohol impairment. In addition, an expert witness testified at the trial that experience in other States demonstrated that, on the whole, sobriety checkpoints resulted in drunken driving arrests of around 1 percent of all motorists stopped. By way of comparison, the record from one of the consolidated cases in *Martinez–Fuerte* showed that in the associated checkpoint, illegal aliens were found in only 0.12 percent of the vehicles passing through the checkpoint. The ratio of illegal aliens detected to vehicles stopped (considering that on occasion two or more illegal aliens were found in a single vehicle) was approximately 0.5 percent. We concluded that this "record ... provides a rather complete picture of the effectiveness of the San Clemente checkpoint," and we sustained its constitutionality. We see no justification for a different conclusion here.

*Id.* at 454–55, 110 S.Ct. 2481 (alteration by court) (citations omitted). The court determined "the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program" and found it consistent with the Fourth Amendment. *Id.* at 455, 110 S.Ct. 2481.

In *State v. Larson,* 485 N.W.2d 571, 573 (Minn.Ct.App.1992), the Minnesota Court of Appeals found "the state failed to present any evidence of the effectiveness of the checkpoint." (citing *Brown,* 443 U.S. at 51, 99 S.Ct. 2637 (holding the court must balance "the degree to which the seizure advances the public interest"); *Prouse,* 440 U.S. at 659–60, 99 S.Ct. 1391 (finding the State presented no empirical evidence that random driver's license checks were effective)). It noted, "Here, *there was no testimony on how many driver's license or equipment violations were uncovered* or other empirical data on the effectiveness of the checkpoint in advancing the public interest." *Id.* (emphasis added) (citing *Chock v. Comm'r of*

*Pub. Safety,* 458 N.W.2d 692, 694 (Minn.Ct.App.1990) (approving legality of sobriety checkpoint on which empirical data of effectiveness was presented)).

■ Vickery argued and the trial court found the State presented no evidence of empirical evidence that led to the determination of the location of the checkpoint.[1] However, the cases on point do not require the State to present pre-existing empirical data to justify setting up the checkpoint. The case law does require some basis for the location of the checkpoint. Here, Officer Byrd testified the checkpoint was placed in that location due to citizen complaints about speeding and loud music. Major Mitchell also testified he had personal knowledge of the problems at the intersection before the checkpoint was set up from seeing incident reports, traffic tickets, and statistics. Additionally, the Traffic Enforcement Activity Reports for dates prior to April 26 show that license checkpoints in the same area resulted in thirty to sixty traffic and criminal offenses on each occasion. Therefore, the trial court committed an error of law in requiring the State to present empirical data to justify the authorization and implementation of the checkpoint.

■ The trial court also suppressed the search because the State's empirical data regarding the effectiveness of the checkpoint was insufficient. The trial court acknowledged the State presented some empirical data regarding the intersection, but that it was insufficient to justify the roadblock. *Prouse, Groome,* and *Sitz* all require some empirical data that supports the second prong of *Brown,* that the seizure serves the public interest. However, none of these cases state how much evidence is considered enough. The United States Supreme Court, as well as our own supreme court, has stressed that no evidence is not enough. Here, we do have some evidence, lying somewhere between *Prouse* and *Sitz.* The two facts that seem to be lacking to paint the entire picture are how many vehicles came through this stop or all of the stops and how many of the tickets were specific to this stop location. According to *Groome,* the question before us is

---

1. The State also had the burden of showing the purpose of the stop and that it served the public interest. The checkpoint was not established by the officers conducting it but rather by their supervisors. Also, this was not a roving stop. None of these factors are at issue in this case.

whether the record supports the trial court's finding that the State's empirical data was insufficient to satisfy the second prong of *Brown*. By showing the stops resulted in a total of forty-eight traffic violations and eight criminal cases including two drug arrests, the State met its burden under the second prong of *Brown* and the trial court erred in determining the State had to put up more evidence to show the checkpoint's effectiveness.

The purpose of the empirical data on the effectiveness is to be able to balance the effectiveness of the checkpoint with the other two prongs set forth in *Brown*, (1) the gravity of the public interest served by the seizure and (3) the severity of the interference with individual liberty. Here, the point of the checkpoint was to prevent traffic offenses and people driving without a license. This serves the public interest in that traffic violations and people driving without a license can cause injury to others. The severity with individual liberty was low in that the stops were marked so drivers could anticipate it and each stop lasted under a minute, if there was no violation. Weighing those two factors with the data provided as to the second factor, effectiveness, the license checkpoint did not violate the Fourth Amendment. Accordingly, the trial court's decision is

**REVERSED AND REMANDED.**

PIEPER and GEATHERS, JJ., concur.