UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel ALFARO, Defendant–Appellant.

No. 90–5629.

United States Court of Appeals,
Fifth Circuit.

June 25, 1991.

Rehearing Denied July 23, 1991.

P. Joseph Brake, Asst. Federal Public Defender and Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for defendant-appellant.

Michael McCrum, LeRoy Morgan Jahn, and Mark Barrett, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, JOLLY and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Wackenhut Corporation owns and runs the South Central Texas Parole Violators Facility, a private jail known simply as "Wackenhut" that houses, predominantly, federal prisoners and detainees. On March 18, 1990, the facility's acting administrator, having received tips that narcotics were being smuggled into the facility, invoked an employee-agreed-to company policy and searched all employees who reported to work that day. Daniel Alfaro, one such searched employee, was found with marijuana on his person and, following the search, was seen tossing a small cocaine-filled bag into a wastebasket. He now appeals his convictions for possession with intent to distribute, respectively, marijuana and cocaine, arguing (1) that his search was nonconsensual, (2) that insufficient evidence supports the jury's finding of an intent to distribute, and (3) that a witness's cross-examination answer merited a mistrial. We reject each argument and thus affirm.

I

Sandra Thacker is the acting administrator at Wackenhut. At some point in time—the record does not reflect precisely when—she learned of an inmate's allegation that approximately five employees, one of them Alfaro, had been bringing drugs into the facility. After hearing this tip, Thacker directed her supervisors to conduct on March 18, 1990, a pat-down search of all employees. Drug Enforcement Agent Thomas Wade (whom Thacker had apprised of her plans) was on hand that day, in the event that the company's efforts indicated a crime.

The search was conducted under the aegis of a Wackenhut policy, to which Alfaro and every other employee had agreed upon accepting employment. That policy, expressed in a company manual, reads in pertinent part:

> It is not the policy of [Wackenhut] to routinely search its employees or their property. However, when the Facility Administrator has reason to suspect that an employee is in possession of contraband items, which, if introduced, could endanger the institution, the Facility Administrator may authorize the search of an employee or his personal property. Searches may also be authorized where the Facility Administrator has reason to suspect that an employee is removing contraband from the facility.

As for the searches themselves, they were carried out in the prison "sally port," an entrance foyer of sorts defined as the area between two barred facility doors.[1]

Alfaro was one of two employees to become ensnared in this trap. Upon entering the sally port on the afternoon of the 18th, he was first told that the company was invoking the aforementioned policy and was then asked "to take the wall." While a guard was closing and locking the outer sally port door—the one through which Alfaro had just passed—Alfaro hesitated, making a statement to the effect that "I have to go outside and talk to Lieutenant [Steve] Morville." However, when company guards again asked him to "get against

---

1. The window in the outside door was covered, so that entering employees would have no in-    kling that their coworkers were being searched.

the wall," and with his route of egress now blocked, Alfaro submitted to the search, albeit nervously. A plastic bag with five cigarettes' worth of marijuana was found stuffed inside his right sock.

In the wake of this discovery, Edward Garcia, another Wackenhut employee, escorted Alfaro from the sally port to the shift commander's office. Garcia testified that, while in the office, Alfaro tossed a small plastic bag filled with a white substance into a nearby trash can. (According to Garcia, Alfaro did so surreptitiously, simultaneously dropping a paper towel into the same wastebasket.) Garcia further testified that, minutes later, Alfaro pointed out a small plastic packet lying on the floor (similar to but distinct from the one Garcia had seen him pitch into the trash can) and suggested "somebody must have dropped it." Tests revealed both bags to contain cocaine, while a third container, discovered under an office desk, was found to be filled with heroin.

Before trial, Alfaro's attorney moved to suppress the evidence obtained through Wackenhut's search, arguing that it was carried out in contravention of the Fourth Amendment. Following a hearing, the district court denied this motion on the ground that the search fell within the company's search policy and therefore was consensual.[2]

With the exception of one exchange between Alfaro's attorney and Garcia, the trial itself was for present purposes uneventful. The exchange in question is as follows:

Q. Okay. You did not participate in the patdown search of him at the sally port?
A. No, I didn't.
Q. Did you?
A. No.
Q. Okay. You were called by Ms. Thacker to come take him to the Captain's office?
A. That's correct.
Q. And that was the first that you knew of anything involving Mr. Alfaro? Is that—

A. If I knew anything about him?
Q. That's the first that you knew of any incident on that day involving Mr. Alfaro was when you were called to take him into the Captain's office. Is that right?
A. Yes, Sir.
Q. Okay. You seem hesitant about that. Had you heard something else?
A. Well, I have an informant who informed me that Mr. Alfaro was bringing in some drugs.
Q. Okay.
*Mr. Brake* [Alfaro's attorney]: Your Honor, I would object to that as being hearsay and not responsive to the question and would ask that it be stricken from the record.
*Mr. Barrett* [Prosecutor]: Your Honor, the question was have you heard anything and I believe the question asked for hearsay.
*The Court:* I will sustain the objection. Objection will be sustained. Members of the jury, disregard the last response by the witness.
*Mr. Brake:* Thank you, Your Honor.
*By Mr. Brake:*
Q. On that day, Lieutenant Garcia, when you were called to escort Mr. Alfaro into the Captain's office, you were not aware that anything had happened until you got there to escort him. Is that right?
A. Yes, Sir.
Q. Okay. That was all that I was asking ...

Alfaro was acquitted of the first charge in a three count indictment—possession of heroin with intent to distribute—but his convictions on the remaining two charges garnered him concurrent sentences, each of which called for incarceration, supervised release, and a fine. Shortly after sentencing, he filed this timely appeal.

## II

As noted above, Alfaro's attack on his convictions poses three assignments of error. We address these in turn.

---

**2.** The court assumed but did not decide that Wackenhut was subject to the Fourth Amend-    ment.

## A

Alfaro's initial contention is that the trial court mistook his agreement to Wackenhut policy for consent to the instant search. In making this contention, Alfaro offers two supporting arguments. First, he insists that the search exceeded the bounds of Wackenhut's policy, thus rendering it nonconsensual. Second, he asserts that while in the sally port and before being searched he withdrew any consent previously given.

■ We find neither of these arguments persuasive. The first argument stands or falls with Alfaro's interpretation of the policy: that the manual sanctions a search *only* when there is reason to suspect the individual being searched. Yet we glean no such meaning from the policy; instead, we construe it as allowing company-wide searches so long as the facility administrator has reason to think that but one employee is carrying illicit drugs to work.[3] Alternatively, even if we were to read the policy as barring searches absent individualized suspicion, that construction would be of no use to Alfaro: his search would still fall within policy limits. As one of the five employees named by the inmate, there was reason to suspect him of wrongdoing. Hence, however dubious the other searches, the policy precondition—suspicion of drug possession—was satisfied as regards Alfaro.

■ Alfaro's second argument fares no better. When an employee, as a condition of employment, has agreed to be searched by his employer, it is questionable at best whether that employee may freely withdraw his consent, short of resignation.

*See Mason v. Pulliam,* 557 F.2d 426, 429 (5th Cir.1977) (*unilateral* grant of consent limited by right to withdraw same). If indeed, however, such a withdrawal is possible, it is nowhere to be found on these facts. When confronted in the sally port, Alfaro only stated once, at most twice, "I have to go outside and talk to Lieutenant [Steve] Morville." He never asked not to be searched, nor did he make any other protestations. His conduct thus falls far short of an unequivocal act or statement of withdrawal, something found in most withdrawal of consent cases. *See United States v. Miner,* 484 F.2d 1075 (9th Cir. 1973) (prospective airline passenger balked at search of luggage, saying "No, it's personal"); *United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971) (defendant exclaimed "[t]he search is over. I am calling off the search"); *United States v. Bily,* 406 F.Supp. 726 (E.D.Pa.1975) (defendant stated "[t]hat's enough. I want you to stop"); *United States v. Ibarra,* 731 F.Supp. 1037 (D.Wyo.1990) (motorist closed and locked trunk). More likely, Alfaro's hesitancy places his appeal within the ambit of *United States v. Brown,* 884 F.2d 1309, 1312 (9th Cir.1989), *cert. denied,* ── U.S. ──, 110 S.Ct. 732, 107 L.Ed.2d 750 (1990), where a defendant who consented to a search of his suitcase but then became extremely reluctant to hand over his suitcase keys was held not to have taken back his consent.

## B

■ Next, Alfaro argues that insufficient evidence undergirds the jury's finding that his possession of the contraband was for distribution purposes. Put another way, Alfaro's contention is that, even when viewed in a light most favorable to the

---

**3.** In support of our reading of the policy, we proffer two observations. First, we note that the manual in its terms does not expressly require individualized suspicion of *all* searched employees. The policy does not read: "... [W]hen the Facility Administrator has reason to suspect that *an employee* is in possession of contraband items ... the Facility Administrator may authorize the search of *the [or "that"] employee* or his personal property" (emphasis added). Instead, the policy reads: "... [W]hen the Facility Administrator has reason to suspect that *an employee* is in possession of contraband

items ... the Facility Administrator may authorize the search of *an employee* or his personal property" (emphasis added).

Second, we note that the final sentence of the policy provides for "*searches*" upon suspicion that "*an* employee" is secreting contraband from the prison (emphasis added).

Incidentally, the policy proscription on "routine" searches does nothing to cast doubt on our construction. Far from being a matter of course, this search by all accounts was an isolated event prompted by an inmate's complaint.

verdict, the evidence below does not permit a reasonable jury to find beyond a reasonable doubt an intent to disseminate cocaine or marijuana.[4]

In support of this argument, Alfaro cites three cases where miniscule portions of confiscated contraband, standing alone, were deemed insufficient to warrant a jury inference of intent to distribute. *United States v. Onick*, 889 F.2d 1425, 1430 (5th Cir.1989) (absent further evidence, heroin and cocaine totaling slightly less than eight grams too little); *United States v. Love*, 599 F.2d 107, 109 (5th Cir.1979) ("loose marijuana" in an eyeglass case insufficient); *United States v. Olvera*, 523 F.2d 1252, 1253 (5th Cir.1975) (two grams not enough). The cocaine attributed to Alfaro was not measured—the marijuana amounted to five joint's worth—yet the government concedes that the "amounts of controlled substances [borne by Alfaro] are [consistent with] personal-use quantities," and that "such evidence alone could not support a criminal conviction...."

Thus, the government turns to factors other than the mere quantum of contraband in an attempt to uphold the convictions. In this we think it is successful. Had Alfaro been found in his house or on the street with the drugs, the meager portions might effectively preclude any distribution conviction. Here, however, he was caught while entering a prison, a fact that affords supplementary inculpatory inferences. A corrections officer, constantly watchful and incessantly under watch, could hardly expect to ingest cocaine or smoke marijuana on the job; hence, the alternative to personal use—distribution—becomes ever more supportable. Similarly, because larger portions would pose in the tightly monitored prison environment too high a risk of detection, any distributor would have little choice but to smuggle his contraband in small increments. In sum, the prison backdrop differentiates this case from the likes of *Onick, Love,* and *Olvera,* where the drugs themselves were the sole indicium of distributory intent. We thus hold that the evidence is sufficient to support the conviction in this context.

## C

 Finally, Alfaro argues that Garcia's reference to an inmate informant demanded a mistrial, the court's curative instruction notwithstanding.[5] We review the refusal to grant Alfaro's mistrial motion under an abuse of discretion standard. *United States v. Baldwin,* 644 F.2d 381, 385 (5th Cir.1981). Where, as is alleged here, prejudicial testimony is at issue, "[r]eversible error exists if the evidence, when viewed in the context of the whole trial, is so highly prejudicial that it would have had a substantial impact on the jurors' verdict." *United States v. Baresh,* 790 F.2d 392, 402 (5th Cir.1986).

Garcia's answer fails to clear this hurdle. The other evidence of Alfaro's intent—namely, the prison environs—was significant if not overwhelming, and the statement was immediately followed by an adequate curative instruction. *See Baresh,* 790 F.2d at 403. Moreover, the government neither exploited nor embellished upon Garcia's slip; indeed, it went unmentioned throughout the trial. *See United States v. Dancy,* 861 F.2d 77, 82 (5th Cir. 1988). These factors, combined with the fact that the statement was a near-direct response to Alfaro's attorney's infelicitous question, compel us to reject his argument.

## III

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

4. Obviously, an element of the offenses for which Alfaro was convicted is the intent to distribute the drug in question. *United States v. Martinez–Mercado,* 888 F.2d 1484, 1491 (5th Cir. 1989).

5. Alfaro also argues that Garcia's reference to the inmate informant violated his confrontation clause rights, citing *Favre v. Henderson,* 464 F.2d 359, 362 (5th Cir.), *cert. den.,* 409 U.S. 942, 93 S.Ct. 235, 34 L.Ed.2d 193 (1972). *Favre,* however, is easily distinguishable in that there the objectionable statement was admitted into evidence. *Favre,* 464 F.2d at 361.