## THE STATE OF SOUTH CAROLINA
### In The Court of Appeals

The State, Respondent,

v.

Michael N. Frasier, Jr., Appellant.

Appellate Case No. 2017-000802

———————————

Appeal From Charleston County
Deadra L. Jefferson, Circuit Court Judge

———————————

Opinion No. 5751
Heard October 15, 2019 – Filed July 29, 2020

———————————

### AFFIRMED

———————————

Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia; and Solicitor Scarlett Anne Wilson, of
Charleston, for Respondent.

———————————

**LOCKEMY, C.J.:** Michael N. Frasier, Jr. appeals his conviction for trafficking
cocaine, arguing the trial court erred by refusing to suppress (1) evidence obtained
from the search of a vehicle when police lacked reasonable suspicion of criminal
activity to extend a traffic stop, (2) evidence found on his person as a result of an

illegal search, and (3) his statement to police taken in violation of *Missouri v. Seibert*.[1] We affirm.

**FACTS**

On the morning of August 14, 2013, Frasier arrived by bus at a transit station in North Charleston, where Cheryl Jones[2] was waiting to pick him up.[3] Soon after Jones and Frasier left the station, North Charleston police stopped Jones for an inoperative third brake light. During the stop, Jones consented to a search of her vehicle. Officers found a large quantity of a substance that appeared to be cocaine and a duffel bag containing men's clothing items and "Superior B"—a substance known as a "cutting agent" for cocaine—in the vehicle. Officers also searched Frasier and found a bus ticket, a straw, and a small Ziploc bag containing a white powdery substance in his pocket. Officers arrested Frasier and he was later indicted for trafficking cocaine.

At the outset of Frasier's jury trial, he moved to suppress the evidence from the vehicle and his pocket, arguing officers extended the traffic stop without reasonable suspicion and he did not consent to the search of his person. Frasier also moved to suppress his statement as involuntary. The trial court held an in camera hearing on the motions. Sergeant Daniel Pritchard of the North Charleston Police Department testified that in 2013, he worked on a task force in the narcotics division. He explained his duties included parcel interdiction, which involved "attempt[ing] to make contact with folks coming in on mass transit." Sergeant Pritchard stated that on August 14, 2013, he and another officer, Detective Ryan Johnson, were observing the bus station from an unmarked vehicle in the parking lot when they saw Frasier exit the bus station. Sergeant Pritchard testified that as he left the station, Frasier "looked left, cleared right, and then proceeded to a vehicle directly in front of the door, entered [the vehicle], and they left." He explained Frasier appeared to be "clearing the area for threats" such as "law enforcement, enemies, something of the sort" and seemed "uncomfortable." Sergeant Pritchard stated Frasier's "scanning" of the parking lot seemed suspicious

---

[1] 542 U.S. 600, 604-12 (2004) (plurality opinion) (holding a postwarning statement was inadmissible when police used a "question first and warn later" tactic, reasoning that "th[e] midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with [the] constitutional requirement[s]" of *Miranda v. Arizona*, 384 U.S. 436 (1966)).

[2] During trial, Jones testified Frasier was her common-law husband.

[3] A toddler was in the backseat of the car.

because the vehicle he entered was "directly in front of the door," yet he looked "at the whole parking lot, left and right." He stated he and Officer Johnson followed in an unmarked vehicle, "were able to get a violation on the vehicle" because the third brake light was out, and contacted patrol to request a traffic stop.

Officer Steve Hall testified he was employed with the North Charleston Police Department for eleven years, consisting of four years of patrol, four years of narcotics, and four years in backup patrol. He stated he conducted "at least 1,000" traffic stops and was familiar with how people reacted to traffic stops. Officer Hall testified he pulled Jones's vehicle over at approximately 8:00 a.m. on August 14, 2013. He recalled that either Sergeant Pritchard or Officer Johnson contacted him and asked him to initiate a traffic stop of the vehicle. Officer Hall testified that when he initiated the stop, he knew the other officers had observed Frasier at the bus stop and they believed there was "something suspicious" about him. He explained that when he first got behind Jones's vehicle, she "made several lane changes, almost in an attempt to evade [him]" and it took her "a few hundred yards" to pull over after he activated his blue lights.[4] Officer Hall explained that when he approached the vehicle, he noticed Jones's pants zipper was "pulled all the way down" and in his experience, people sometimes tried to hide narcotics in "their pants or crotch area." He acknowledged that after Jones got out of the vehicle, he asked her why her pants were unzipped and she said she had just gotten out of the shower and left quickly to go to the bus station.

Officer Hall stated Frasier seemed "nervous" because he was sweating profusely and avoided eye contact with him. He noted the outside temperature was about seventy-five or eighty degrees at the time. Officer Hall averred that based on his experience, Frasier's nervousness appeared "a little more elevated" than a "normal traffic stop." He stated he asked Jones and Frasier where they were coming from several times but they never gave him a clear answer and he felt they "were being evasive." Officer Hall explained that "with the totality of everything," including what the detectives told him, as well as Jones's delay in pulling over, her unzipped pants, and Jones and Frasier failing to directly answer his questions, "[his] interest was piqued highly that something was amiss." He agreed, based on his experience in narcotics, that it was "common for people who traffic and deal with narcotics to utilize the mass transit and bus system" to bring drugs into the community, and this was another "significant factor" that "piqu[ed]" his interest. Officer Hall also recalled Jones opening her car door when he was writing the ticket, which he

---

[4] Officer Hall's dashboard camera captured the stop and the remainder of the encounter with Jones and Frasier.

thought "seemed a little odd" because he did not "know why someone would try to get out" and did not "see [that] very often."

After writing Jones a warning ticket for the brake light but before giving it to her, Officer Hall asked her to exit the vehicle. He then asked Jones for consent to search the vehicle, which she provided, and one of the officers asked Frasier to exit the vehicle as well. Officer Hall asked Frasier "if he minded if [he] checked him out or searched him," and Frasier stated, "I do, but," and then turned around and put his hands on top of the vehicle. Officer Hall interpreted this as meaning, "I do mind, but proceed [with the search]." He then searched Frasier and found a "small plastic Ziploc bag[] of white powder substance" in his pocket and placed him under arrest. Officer Hall stated he did not read Frasier his *Miranda*[5] rights immediately because when he began to place Frasier in handcuffs, Frasier "kind of tensed . . . or flexed up" and Officer Hall "threw [his] attention towards that." He explained reading a person his *Miranda* rights "can add to the tension" and he was "trying to de-escalate" the situation.

Thereafter, the officers searched the vehicle and found what appeared to be a large quantity of cocaine in a jacket pocket in the backseat. As shown in the video from the dashboard camera, Officer Hall, after reaching into the back seat of the vehicle, stood up and asked, "[W]hose jacket?" while holding the jacket over his head. Frasier then claimed ownership of the jacket. Remaining where he stood, Officer Hall then asked, "[T]hat's your jacket? Do you know what's in your jacket? What would be in your jacket?" Officer Hall continued questioning Frasier for a few more seconds, but he did not respond. Frasier and Jones were both in handcuffs at the time.

Officers then placed Frasier in the back of a police cruiser. Officer Hall stated that he then read Frasier his *Miranda* rights and this took place about twenty-eight minutes after the arrest. He testified Frasier did not appear to be intoxicated, was able to communicate with him, and seemed to understand his rights. Officer Hall denied engaging in a tactic of delaying reading Frasier his *Miranda* warnings to elicit an incriminating response. He stated he again asked Frasier about the jacket

---

[5] *Miranda*, 384 U.S. at 479 (holding that in order for a statement given by a defendant during custodial interrogation to be admissible, the record must show law enforcement advised him of his right to remain silent and his right to counsel and gave him the "[o]pportunity to exercise these rights . . . throughout the interrogation" and after being so advised, he "knowingly and intelligently waive[d] these rights and agree[d] to answer questions or make a statement").

and he gave the same answer.  Officer Hall denied threatening Frasier, promising him leniency, or threatening to arrest Jones if he did not admit the drugs were his.

On cross-examination, Officer Hall explained he did not "stop to try to clarify what [Frasier] meant" when he stated "I do, but" because Officer Hall did not believe anyone ever "want[ed] to be searched," and he, too, "would mind if someone wanted to search [him]."  Officer Hall explained that after Frasier stated, "I do, but," Frasier "turn[ed] around and, if you will, assume[d] the position like he was okay with it."  He agreed Frasier asked, "My pockets too?" but never said "stop" or "stop doing that."  Officer Hall acknowledged he was about six-feet tall and weighed about 200 pounds, the other responding officer had a similar build, and both were armed with pistols, stun guns, pepper spray, and batons during the stop.

Officer Hall acknowledged that when he asked about the jacket, Jones had just been placed in handcuffs.  He explained that after Frasier stated, "They don't have nothing to do with it," Officer Hall stated, "She's just be[ing] detained right now.  I am not saying she's under arrest."  Frasier asked if this implied that if he claimed the drugs, she would not be arrested; Officer Hall responded, "Right, pending further investigation."  He agreed that after Frasier claimed the jacket, the officers released Jones and the child.  Officer Hall conceded that after he read Frasier his *Miranda* rights he resumed questioning by asking, "[Y]ou are telling me the jacket is yours," which was a continuation of the questions he asked about eight minutes earlier.  He acknowledged he told Frasier that if he "sp[oke] up," he "c[ould] get people there . . . who c[ould] help him."  Officer Hall explained he was not trying to convince Frasier to "admit the drugs were his"; instead, he meant that Frasier "could potentially work off these charges and help himself."

The State argued the officers lawfully extended the traffic stop and contended the following facts created a reasonable suspicion under the totality of the circumstances: (1) officers observed Frasier "scanning" the bus station parking lot before entering a vehicle parked close to the door, (2) Jones's pants were unzipped, (3) Frasier behaved nervously, (4) Jones and Frasier failed to directly answer the officer's questions, (5) Jones delayed in stopping her vehicle, and (6) Jones opened her car door during the traffic stop.  The State conceded whether Frasier consented to the search of his person was a "close call" but argued the officer believed Frasier consented based upon the interaction.[6]

---

[6] The parties agreed the search of Frasier's person was not a "*Terry* frisk."  *See Terry v. Ohio*, 392 U.S. 1 (1968) (holding that under certain circumstances, an

Frasier argued the officers unlawfully extended the traffic stop because the purpose of the stop had already concluded when the officer asked Jones to exit the vehicle. He asserted the officers had no reasonable suspicion to detain them after that point. Frasier argued that regardless of what his body language indicated, when officers searched him he thought he "d[id]n't have a choice" because "they [we]re going to search [him] anyway." The court responded,

> I don't know what was in his mind. I can only judge objectively what I see on the video. [Frasier] didn't testify. Nobody can speculate what [his] state of mind was. I can only judge the reasonable unambiguous meaning of his words and his body language. And he doesn't have to testify. He doesn't have any burden of proof. But I cannot base a decision on what I speculate to be his state of mind. I can only look at a video and tell me [sic] what it says.

Frasier argued the officers did not ask if they could search him but rather they asserted, "You don't mind if [we] check you real quick." He argued he submitted to the officers' authority but did not voluntarily consent, and even if he consented, he revoked his consent by protesting when officers began to search his pockets.

The State conceded Frasier's prewarning statements were inadmissible. Frasier argued that pursuant to *Seibert,* the court should exclude his postwarning statements as well. He also argued that under *State v. Corns,*[7] the statements were involuntary because he made them in response to the officer's implication that he would arrest Jones if Frasier did not claim the drugs.

After briefly taking the matter under advisement, the trial court ruled all of Frasier's post-*Miranda* statements were admissible. The trial court distinguished the officer's first questioning from the postwarning questioning, stating that once Frasier was placed in the back of the cruiser, "any questioning of him was designed

---

officer may "conduct a carefully limited search of [a person's] outer clothing . . . in an attempt to discover weapons [that] might be used to assault him").

[7] 310 S.C. 546, 552, 426 S.E.2d 324, 327 (Ct. App. 1992) (finding officers' testimony that they told the defendant his wife could be arrested and their children could be taken from them amounted to improper influence rendering his statement involuntary).

to inculpate him."  The trial court noted Frasier had previous interactions with law enforcement and therefore had sufficient education and awareness to understand his *Miranda* rights and know he did not have to answer.[8]  The trial court reasoned officers had not used *Miranda* "[to] clean up an inappropriate interrogation" but instead had directed their first question to both Frasier and Jones, and that question could have inculpated either of them.  The court stated that although it would have been prudent to "*Mirandize*" Frasier immediately upon arrest, the officer testified Frasier "flexed" when he handcuffed him and he felt that if he administered *Miranda* warnings at that time it might have escalated tensions.  The court found Officer Hall "credible, that in hindsight, he thought it would have been better" to read *Miranda* warnings immediately.  The trial court stated that according to the video, Frasier appeared to be oriented as to time and place and nothing indicated he was under the influence of any substances or did not understand the warnings.  In addition, the trial court rejected Frasier's argument that he claimed the jacket because he felt threatened officers would arrest Jones.

The trial court next found Frasier consented to the search of his person.  The court determined that according to the video, notwithstanding Frasier's verbal comments, "his body language [wa]s clearly consensual" and he "very clearly, by his behavior, in a noncoerced way, turn[ed] and put[] his hands on the car and consent[ed] to his person being searched."  The trial court noted the officer did not put his hands on Frasier in any way and his tone was not threatening but was "very moderate."  In addition, the court reasoned that regardless of what Frasier's inner thoughts might have been, it could not "speculate about what was in someone's consciousness when they did what they did."  The trial court noted that when he said, "[E]ven my pockets too?" he could have said, "I don't want you in my pockets" but did not.

Next, although the trial court acknowledged it was "at best a 50/50 call," it concluded officers had an objectively reasonable and articulable suspicion to extend the stop beyond its initial purpose based upon the totality of the circumstances.  The trial court noted it had to consider the officers' subjective opinions about what they perceived in determining whether, from an objective standpoint under the totality of the circumstances, there was reasonable suspicion.  The court found the officers "articulated many factors" and "what they believed to be the basis of a reasonable and articulable suspicion to extend the stop," and it concluded such "testimony [wa]s reasonable and supported by the facts."  The trial court found Sergeant Pritchard's observations of Frasier at the bus station were part

[8] The State noted Frasier had several prior drug-related charges on his record and was convicted of a drug offense in 1999 that was reversed on appeal.

of the totality of the circumstances.  However, the court declined to include Jones's purported delay in pulling over as part of its analysis, finding this delay was reasonable under the circumstances.[9]  In addition, the trial court concluded the officer's testimony about what he "perceived objectively based on his experience and training" was credible and amounted to a reasonable articulable suspicion.  The trial court reached these conclusions after reviewing the complete video of the traffic stop, hearing the testimony of the officers, and engaging in an extensive exchange with counsel.  Finally, the court concluded that because there was reasonable suspicion to extend the stop, Jones's consent to search the vehicle was valid, and all evidence obtained from that search was admissible.

During trial, Sergeant Pritchard and Officer Hall testified consistently with their pretrial testimony.  The State also called Jones as a witness.  Jones denied giving consent to search her vehicle; however, the State impeached her by playing the video, which showed her consenting to the search.  Frasier timely renewed all objections contemporaneously with the admission of the evidence, and the trial court admitted the evidence over his objections.  The jury found Frasier guilty of trafficking cocaine, and the trial court sentenced him to twenty-five years' imprisonment.  This appeal followed.

## ISSUES ON APPEAL

1.  Did the trial court err by refusing to suppress evidence obtained from the search of Jones's vehicle?

2.  Did the trial court err by refusing to suppress evidence obtained from the search of Frasier's person?

3.  Did the trial court err by refusing to suppress Frasier's postwarning statements in violation of the rule established in *Missouri v. Seibert*?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only."  *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001).  "On appeals from a motion to suppress based on Fourth Amendment grounds, this [c]ourt applies a deferential standard of review and will reverse if there is clear error."  *State v. Tindall*, 388

---

[9] Because the trial court declined to consider Jones's delay as a factor, we likewise exclude this in determining whether the evidence supports the court's ruling.

S.C. 518, 521, 698 S.E.2d 203, 205 (2010). "The 'clear error' standard means that an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently." *State v. Moore*, 415 S.C. 245, 251, 781 S.E.2d 897, 900 (2016) (quoting *State v. Pichardo*, 367 S.C. 84, 96, 623 S.E.2d 840, 846 (Ct. App. 2005)). "Rather, appellate courts must affirm if there is any evidence to support the trial court's ruling." *Id.* (quoting *State v. Provet*, 405 S.C. 101, 107, 747 S.E.2d 453, 456 (2013)). "However, this deference does not bar this [c]ourt from conducting its own review of the record to determine whether the trial [court]'s decision is supported by the evidence." *Tindall*, 388 S.C. at 521, 698 S.E.2d at 205.

"On appeal, the conclusion of the trial [court] on issues of fact as to the voluntariness of a confession will not be disturbed unless so manifestly erroneous as to show an abuse of discretion." *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 247 (1990). "When reviewing a trial court's ruling concerning voluntariness, this [c]ourt does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence." *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001).

## LAW/ANALYSIS

### I. Extension of Traffic Stop

Frasier argues the trial court's ruling constituted clear error because the record did not support its finding that law enforcement had a reasonable articulable suspicion to justify the extended traffic stop and detention.[10] He asserts the "purported vague suspicious" behavior the officers observed at the bus station, Jones's delay in stopping and her unzipped pants, the opening of the driver's side door, and Frasier's nervousness did not give rise to an objectively reasonable and articulable suspicion that illegal activity was occurring. Frasier contends any purported consent he or Jones provided was "obtained through Officer Hall's exploitation of the unlawful detention" and therefore ineffective. We disagree.

The question before this court is whether there is "any evidence to support the trial court's finding of reasonable suspicion—not [our own] . . . independent view of the facts." *Moore*, 415 S.C. at 253, 781 S.E.2d at 901; *see also Provet*, 405 S.C. at 107, 747 S.E.2d at 456 ("South Carolina appellate courts review Fourth

---

[10] Frasier does not challenge the initial stop on appeal.

Amendment determinations under a clear error standard. We affirm if there is any evidence to support the trial court's ruling." (citation omitted)).

"A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "In carrying out a routine traffic stop, a law enforcement officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Tindall*, 388 S.C. at 521, 698 S.E.2d at 205. "Any further detention for questioning is beyond the scope of the stop and therefore illegal unless the officer has reasonable suspicion of a serious crime." *Id.*

"The term 'reasonable suspicion' requires a particularized and objective basis that would lead one to suspect another of criminal activity." *Pichardo*, 367 S.C. at 104, 623 S.E.2d at 851. "[C]ourts must give due weight to common sense judgments reached by officers in light of their experience and training." *Moore*, 415 S.C. at 252-53, 781 S.E.2d at 901 (alteration in original) (quoting *State v. Taylor*, 401 S.C. 104, 113, 736 S.E.2d 663, 667 (2013)). "In determining whether reasonable suspicion exists, the whole picture must be considered." *Pichardo*, 367 S.C. at 104, 623 S.E.2d at 851; *see also United States v. Sokolow*, 490 U.S. 1, 8 (1989) ("In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.'" (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981))). "The test whether reasonable suspicion exists is an objective assessment of the circumstances; the officer's subjective motivations are irrelevant." *Moore*, 415 S.C. at 252, 781 S.E.2d at 901 (quoting *Provet*, 405 S.C. at 108, 747 S.E.2d at 457).

Because we must evaluate the trial court's findings for clear error, we reluctantly conclude evidence supported the trial court's finding the officer had reasonable suspicion to extend the stop. *See Moore*, 415 S.C. at 251, 781 S.E.2d at 900 ("The 'clear error' standard means that an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently." (quoting *Pichardo*, 367 S.C. at 96, 623 S.E.2d at 846)); *Wilson*, 345 S.C. at 6, 545 S.E.2d at 829 ("This [c]ourt does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial [court]'s ruling is supported by any evidence."). Here, Officer Hall testified that he had four years of experience in narcotics, had four years of patrol experience, and had conducted at least 1,000 traffic stops. He stated that at the time he initiated the stop, he knew Frasier had come from the bus station and narcotics officers had noticed something suspicious about him. Officer Hall testified that in his

experience, people commonly used the bus system to bring narcotics into the community. He explained that when he first approached Jones's vehicle, her pants were fully unzipped and in his experience, people sometimes hid narcotics in their crotch area. Additionally, Officer Hall averred Frasier's level of nervousness was "a little more elevated" than what he normally saw during a traffic stop. Further, he stated Jones and Frasier evaded his questions about where they were coming from. Finally, he stated Jones's opening the driver's side door struck him as "a little odd" because it was an uncommon occurrence during traffic stops. Officer Hall stated that based on these observations, his "interest was piqued highly that something was amiss."

Although we acknowledge that several of these factors would likely be insufficient standing alone to support a finding of reasonable suspicion, they must be viewed under the totality of the circumstances. *See Moore*, 415 S.C. at 253, 781 S.E.2d at 901 (acknowledging "many of the factors offered by the State seem innocent when viewed in isolation," but finding there was "evidence to support the trial court's finding of reasonable suspicion to prolong the traffic stop given the totality of the surrounding circumstances"); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (recognizing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). Officer Hall's testimony linked the foregoing observations to the knowledge he gained from his experience in law enforcement to explain why Jones's and Frasier's behaviors caused him concern. Therefore, in view of the totality of the circumstances, we find Officer Hall's testimony supports the trial court's finding that the decision to further detain Jones and Frasier was based on reasonable articulable suspicion. *See Pichardo*, 367 S.C. at 104, 623 S.E.2d at 851 (noting that reasonable suspicion "requires a particularized and objective basis that would lead one to suspect another of criminal activity"); *Moore*, 415 S.C. at 252-53, 781 S.E.2d at 901 ("[C]ourts must give due weight to common sense judgments reached by officers in light of their experience and training." (alteration in original) (quoting *Taylor*, 401 S.C. at 113, 736 S.E.2d at 667)). We find the trial court applied the correct legal analysis and evidence in the record supports its findings. We therefore affirm the trial court's refusal to suppress the evidence obtained from the search of the vehicle.

## II. Search of Frasier's Person

Frasier argues the trial court erred by finding he gave officers consent to search his person because his "begrudging submission" to their request was not consent. He asserts he demonstrated non-consent by stating, "I do, but" when the officer asked him if he minded if the officer searched him and he merely submitted to the search

when he placed his hands on the vehicle. Frasier contends he was surrounded by two armed and uniformed officers, was not informed of his right to decline the search, and did not feel free to leave. We disagree.

"Warrantless searches and seizures are reasonable within the meaning of the Fourth Amendment when conducted under the authority of voluntary consent." *Palacio v. State*, 333 S.C. 506, 514, 511 S.E.2d 62, 66 (1999). "The existence of consent is determined from the totality of the circumstances." *Id.* "Whether a consent to search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the 'totality of the circumstances.'" *State v. Wallace*, 269 S.C. 547, 550, 238 S.E.2d 675, 676 (1977). "The burden is on the State to show voluntariness." *Id.* Although "the subject's knowledge of a right to refuse is a factor to be taken into account, the [State] is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973).

"Conduct falling short of 'an unequivocal act or statement of withdrawal' is not sufficiently indicative of an intent to withdraw consent." *State v. Mattison*, 352 S.C. 577, 587, 575 S.E.2d 852, 857 (Ct. App. 2003) (quoting *United States v. Alfaro*, 935 F.2d 64, 67 (5th Cir. 1991)). "Effective withdrawal of a consent to search requires unequivocal conduct, in the form of either an act, statement or [a] combination of the two, that is inconsistent with consent previously given." *Id.*

We find evidence supports the trial court's finding that Frasier consented to the search of his person. *See Wilson*, 345 S.C. at 6, 545 S.E.2d at 829 ("This [c]ourt does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial [court']s ruling is supported by any evidence."). Here, Frasier can be seen and heard in the video stating, "I do, but" when the officer asked if he minded if he "checked" him and then he turned around and placed his hands on top of the vehicle. When the officer began to search his pockets, Frasier stated, "my pockets too?" but did not tell the officers to stop or otherwise revoke his consent. Additionally, Officer Hall testified that even though Frasier said he "mind[ed]," he then turned around and placed his hands on the vehicle, which Officer Hall perceived as permission. Further, he stated Frasier never said "stop" or "stop doing that." Finally, the record contains no evidence officers used or threatened the use of force to coerce Frasier to consent. The trial court found that according to the video, notwithstanding Frasier's statements, "his body language [wa]s clearly consensual" and he "very clearly, by his behavior, in a noncoerced way, turn[ed] and put[] his hands on the vehicle and consent[ed]" to the search. The trial court stated it could not speculate as to Frasier's inner

thoughts but found he did not revoke his consent by stating "even my pockets too?" because this was not an unequivocal act or statement revoking consent. We find Frasier's conduct depicted in the video as well as Officer Hall's testimony support a conclusion that, by Frasier's words and conduct, he voluntarily consented to the search and did not effectively withdraw that consent at any point during the search. Accordingly, we find the trial court did not err by concluding Frasier consented to the search, and we affirm its denial of his motion to suppress.

## III. Voluntariness of Frasier's Statement

Frasier argues the trial court erred by refusing to suppress his statement claiming ownership of the jacket found in the vehicle as involuntary and in violation of *Seibert*. He asserts that although the officer's initial questioning about the ownership of the jacket was not lengthy, the same officer conducted the second, post-*Miranda* questioning, which occurred only eight minutes later. Additionally, Frasier contends his statement was involuntary because he made it after law enforcement's veiled threat to arrest Jones. We disagree.

"On appeal, the conclusion of the trial [court] on issues of fact as to the voluntariness of a statement will not be disturbed unless so manifestly erroneous as to show an abuse of discretion." *State v. Kennedy*, 333 S.C. 426, 429, 510 S.E.2d 714, 715 (1998). "The State bears the burden of proving by a preponderance of the evidence that a defendant's rights were voluntarily waived after being advised of his *Miranda* rights." *State v. Osborne*, 301 S.C. 363, 365, 392 S.E.2d 178, 179 (1990). "Interrogation is the express questioning, or its functional equivalent[,] which includes 'words or actions on the part of the police . . . that the police should know *are reasonably likely to elicit an incriminating response*." *Kennedy*, 333 S.C. at 431, 510 S.E.2d at 716 (second alteration in original) (quoting *State v. Sims*, 304 S.C. 409, 417, 405 S.E.2d 377, 381 (1991)).

"The purpose of *Miranda* warnings is to apprise a defendant of the constitutional privilege not to incriminate oneself while in the custody of law enforcement." *State v. Medley*, 417 S.C. 18, 24, 787 S.E.2d 847, 850 (Ct. App. 2016). In *Seibert*, the Unites States Supreme Court considered the admissibility of a repeated statement elicited pursuant to a police practice of "question first, warn later." 542 U.S. at 604-06 (plurality opinion). The Court identified "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object." *Id.* at 615. These facts consist of the following:

[T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* Discussing the case of *Oregon v. Elstad*, 470 U.S. 298 (1985), the Court noted that when unwarned questioning took place during a short conversation at the suspect's home followed by delivery of *Miranda* warnings to the suspect at the police station, "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience." *Seibert*, 542 U.S. at 615. The Court opined that under such circumstances, "the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Id.* at 615-16.

We find Officer Hall's testimony and the contents of the video support the trial court's finding that, based on the totality of the circumstances, Frasier's postwarning statement, in which he admitted to owning the jacket, was voluntary notwithstanding Officer Hall's pre-warning questioning. *See Rochester*, 301 S.C. at 200, 391 S.E.2d at 247 ("On appeal, the conclusion of the trial [court] on issues of fact as to the voluntariness of a confession will not be disturbed unless so manifestly erroneous as to show an abuse of discretion.").

First, as to the completeness and detail of the questions and answers during the first round of interrogation, the question asked was, "Whose jacket?", and Frasier admitted it was his. Although Officer Hall continued to question Frasier for a few more seconds about what was in the jacket, Frasier did not respond. We find the foregoing supports the trial court's finding that Officer Hall directed his initial question to both Jones and Frasier and it could have incriminated either. Second, as to the timing and setting of the first and second round of questioning, the trial court concluded the first and second round of questioning was distinct and found that once the officers had placed Frasier in the vehicle, "any questioning of him was designed to . . . incriminate him." Additionally, the trial court noted Frasier had previous "contact with the system" and had sufficient knowledge and education to know that he had the right to remain silent. We find the evidence supports the trial court's finding that the timing and setting of the two rounds of questioning were sufficiently different for Frasier to appreciate that the second round of questioning was a new and distinct experience. Here, the initial

questioning was informal and occurred while Frasier was standing next to the police cruiser and Officer Hall was several yards away. The postwarning questioning was more formal and took place after officers had placed Frasier in the back of the police cruiser, and Officer Hall sat in the front of the cruiser. In addition, there was a break of several minutes between the first and second round. Officer Hall denied engaging in any tactic of delaying reading Frasier his *Miranda* warnings in order to elicit an incriminating response and denied threatening Frasier or promising him leniency or threatening to arrest Jones if Frasier did not claim the drugs. We find the foregoing supports the trial court's finding the timing and setting of the two rounds of questioning weigh in favor of admissibility.

Finally, as to the second and fourth *Seibert* factors, we acknowledge the same officer questioned Frasier both before and after he received his *Miranda* warnings and Frasier's statements contained overlapping content. Nevertheless, we find the foregoing evidence supports the trial court's conclusion that Frasier's postwarning statements were voluntary and admissible. *See Saltz*, 346 S.C. at 136, 551 S.E.2d at 252 ("When reviewing a trial court's ruling concerning voluntariness, this [c]ourt does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence.").

Further, we find evidence supports the trial court's rejection of Frasier's argument he claimed ownership of the jacket because he felt threatened officers would arrest Jones. Although the burden was upon the State to prove voluntariness, Frasier provided no testimony he felt coerced or threatened by the fact officers had placed Jones in handcuffs. The video recording shows Officer Hall made no express threat to arrest Jones if Frasier did not confess. Therefore, the trial court did not err by refusing to exclude the statement on this basis.

## CONCLUSION

For the foregoing reasons, we find the trial court did not err by concluding officers lawfully extended the traffic stop, Frasier consented to the search of his person, and his statement was voluntary. We therefore affirm the trial court's denial of Frasier's motions to suppress. Accordingly, Frasier's conviction is

**AFFIRMED.**

**KONDUROS and HILL, JJ., concur.**